UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HENSTOOTH RANCH LLC,<br>　　　　Plaintiff,<br>　　v.<br>THE BURLINGTON INSURANCE COMPANY,<br>　　　　Defendant. | Case No. 17-cv-00006-SI<br><br>**ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br>Re: Dkt. Nos. 40, 45 |

This is an insurance coverage dispute. Plaintiff Henstooth Ranch, LLC moves for partial summary judgment, seeking a declaration that defendant The Burlington Insurance Company has a duty to defend Henstooth in an underlying action. Pl.'s Mot. (Dkt. No. 40). Burlington filed a cross-motion for summary judgment in its favor. Def.'s Mot. (Dkt. No. 45-1). After considering the parties' materials and arguments, the Court DENIES plaintiff's motion and GRANTS defendant's cross-motion.

**BACKGROUND**

Burlington is an insurance company with administrative offices in North Carolina. Complaint (Dkt. No. 1-1). Henstooth is a limited liability corporation organized under California law. Declaration of Peter Thompson (Dkt. No. 40-3) ¶ 2. Toni and Peter Thompson are officers of Henstooth. *Id.* ¶ 3. Henstooth owns certain property in Santa Rosa, California ("Henstooth Property"). *Id.* ¶ 4. Adjacent to the Henstooth Property is a parcel personally owned by the

Thompsons and subject to a conservation easement held by the Sonoma Land Trust ("SLT") ("the Easement Property").[1] *Id.* ¶¶ 5-6.

Henstooth filed this lawsuit seeking declaratory relief concerning Burlington's duty to defend and indemnify Henstooth under a commercial general liability insurance policy. Complaint (Dkt. No. 1-1). This declaratory relief action arises from an underlying case filed on November 10, 2015, entitled *Sonoma Land Trust v. Peter Thompson, et al.*, Sonoma County Superior Court, Case No. SCV-258010 ("Underlying Action"). Thompson Decl., Ex. A.

## I.  Terms of the Insurance Policy

Burlington issued a Commercial General Liability insurance policy to Henstooth, effective June 12, 2014 through June 12, 2015. Thompson Decl., Ex. C; Declaration of William C. Morison (Dkt. No. 45-2), Ex. 1. The Policy has limits of $1,000,000 per occurrence, $1,000,000 for personal and advertising injury, and $2,000,000 in the aggregate. *Id.* The policy's liability insuring clause for property damage provides as follows:

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage: to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section III – Limits of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

---

[1] The complaint in the underlying action alleges that based on Sonoma County records, the Thompsons own the Easement Property. Underlying Compl. ¶ 8. However, an attorney for the defendants in the underlying action allegedly informed SLT "in writing that Henstooth Ranch LLC (rather than the Thompsons) is also the fee owner of the [Easement Property], notwithstanding the Sonoma County records indicating otherwise." *Id.* ¶ 10.

2

> No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments—Coverages A and B.
>
> **b.** This insurance applies to "bodily injury" or "property damage" only if:
>
> > **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";
> >
> > **(2)** The "bodily injury" or "property damage" occurs during the policy period; and
> >
> > **(3)** The "bodily injury" and "property damage", whether known or unknown:
> >
> > > **(a)** Did not first occur prior to the inception date of the policy;
> > >
> > > **(b)** Was not in the process of occurring or alleged to have been in the process of occurring, as of the inception date of the policy; or
> > >
> > > **(c)** Was not in the process of settlement, adjustment, "suit" or other proceeding of any kind . . . .

*Id.* Section V of the Policy defines "occurrence" to mean "an accident, including continuous or repeated exposure to substantially all the same general harmful conditions." *Id.* It defines "property damage" to include "[p]hysical injury to tangible property, including all resulting loss of use . . . ." *Id.* "Suit" is defined as "a civil proceeding in which damages because of 'bodily injury,' 'property damage' or 'personal and advertising injury' to which this insurance applies are alleged." *Id.*

## II. The Underlying Complaint

In November 2015, SLT filed suit against Toni Thompson, Peter Thompson, and Henstooth. SLT alleges a claim for breach of contract against Toni and Peter Thompson, and claims for violation of the conservation easement (Cal. Civ. Code § 815.7) and for cutting, carrying off, or injuring trees (Cal. Civ. Code § 3346, Cal. Code Civ. Proc. § 733) against all the defendants.[2] SLT alleges the following:

---

[2] At the hearing, counsel noted that in the underlying action, the only cause of action remaining is for violation of the conservation easement.

3

SLT acquired a conservation easement over the entire Easement Property in 2009 "to preserve the Property's natural habitat, scenic, and open spaces value . . . in perpetuity." Underlying Compl. ¶ 18. The Easement "expressly prohibits . . . constructing any new roads, using any off-road motorized vehicles, excavating or removing any soil, and pruning, cutting, removing, or destroying any tree," subject to certain limitations. *Id.* ¶ 19. The Easement also requires "[d]efendants to request and to obtain [SLT's] written approval for a 'vegetation management plan' prior to undertaking any restoration activities, and it expressly prohibits any other uses of the Property that are inconsistent with its stated purposes." *Id.* "Public records indicate that the Thompsons paid nearly $1 million less for the Property, as encumbered by the Easement, than the previous owners had paid for it prior to granting the Easement to the Trust." *Id.* ¶ 25.

In October 2014, SLT learned that the Thompsons "had begun extensive work" on the Easement Property, "including unauthorized movement of soils and removal of vegetation." *Id.* ¶ 31. The Thompsons "were in the process of constructing a new road to move [a 180-year old] Oak Tree" from the Easement Property to "a neighboring parcel of land on which they were constructing a home," presumably the Henstooth Property. *Id.* During a site visit, SLT staff "observed a newly graded road running nearly the length of the Property from its northern boundary adjacent to Defendants' new home, to the 180-year old Oak Tree." *Id.* ¶ 33. Additionally, "a large trench had been excavated around the Oak Tree and its root system," "[a] significant area around the tree had been disturbed, other vegetation had been cut out, and earth and rocks were piled along the sides of the new road." *Id.* SLT staff "also learned of a separate incident in which the Thompsons or their contractors had spread out sediment dredged from a pond on their neighboring property across nearly half an acre of the Property protected by the Easement." *Id.* ¶ 34.

In November 2014, SLT "observed that additional grading had occurred." *Id.* ¶ 35. In June 2015, SLT "observed that still further grading had been conducted and that a new culvert and additional short road had been installed and constructed." *Id.* ¶ 36. SLT also noted "the extensive further damage to the Property that had been caused both by Defendants' asserted efforts 'to

4

restore' the Property and by their initial unlawful activities," including "further dispersion of non-native species and weeds and significant additional erosion and scarring of the landscape." *Id.* "Defendants did not provide [SLT] with advance notice of, or request [SLT's] permission, prior to undertaking" any of these activities. *Id.* ¶ 37.

SLT communicated with the Thompsons "repeatedly in November and December 2014 to explain the requirements of the Easement" and SLT's need to visit the property. *Id.* ¶ 39. But the Thompsons "delayed and canceled scheduled site visits . . . and they denied or delayed [SLT's] access to the Property on several occasions." *Id.* On December 9, 2014, SLT sent the Thompsons a formal Notice of Violation and Remedies describing how the activities violated the easement and detailing the steps SLT required them to undertake to restore the property, including retaining a consultant to prepare a restoration plan and submitting the restoration plan to SLT. *Id.* ¶ 40.

In the spring of 2015, rather than submitting a restoration plan to SLT, "[d]efendants unilaterally undertook their own 'restoration' efforts," which failed and instead caused further harm by "fostering growth of non-native species and weeds and subsequently causing further erosion that reached bedrock in some locations." *Id.* ¶¶ 41-42. Also during this period, "[d]efendants . . . conducted additional unlawful grading on the Property and installed a culvert and a short new road on the Property in an area adjacent to their home-site." *Id.* ¶ 42. After this, the Thompsons hired a contractor recommended by SLT to create a restoration plan. *Id.* ¶ 43.

Although the restoration plan was drafted, defendants' counsel did not share it with SLT and defendants "stated that they intended to unilaterally undertake additional 'restoration' activities without providing [SLT] any opportunity to review the [r]estoration [p]lan." *Id.* ¶ 44. However, after further discussions, the Thompsons provided the restoration plan to SLT and agreed not to undertake further unilateral efforts to restore the property. *Id.* ¶ 45. Based on SLT's concerns, the Thompsons agreed to have their consultant create a revised restoration plan, which was provided to SLT on October 19, 2015. *Id.* ¶ 46. The revised plan, however, did not include several actions necessary to fully restore the Easement Property. *Id.* ¶ 47. However, the plan did state that remedial action should be complete "before October 31st if feasible or before the start of the rainy season." *Id.* On November 5, 2015, SLT granted the Thompsons written

5

1 approval to perform certain activities described in the revised plan, "subject to certain specified
2 conditions." *Id.* ¶ 50. The Thompsons did not agree to those conditions. *Id.*

3 The initial damage to the Easement Property from "when the Thompsons first graded the
4 road, removed the Oak tree, and disposed of dredged materials has worsened significantly over
5 time due to both erosion of unprotected soils and the Thompsons' own, additional activities on the
6 Property." *Id.* ¶ 51. "With the onset of the rainy season, these conditions—especially the areas
7 that have been excavated and improperly graded—are at substantial risk of further erosion,
8 deterioration, and further loss of fragile topsoil." *Id.*

### III. Procedural Background

The underlying action was filed on November 10, 2015. Henstooth and the Thompsons denied liability and damages. Thompson Decl., ¶ 8, Ex. B. Henstooth retained counsel to defend it in the underlying case and "has incurred substantial defense fees and costs[.]" *Id.* ¶ 9. Henstooth tendered the underlying action to Burlington and Burlington denied coverage, asserting that the lawsuit did not arise from an "occurrence" as defined in the Policy. Henstooth filed this declaratory relief action in Contra Costa County Superior Court on November 21, 2016 and served Burlington on December 20, 2016. *See* Notice of Removal (Dkt. No. 1) ¶ 6; *id.* Ex. 1, Complaint (Dkt. No. 1-1) at 2-6. Burlington removed the action to this Court on January 3, 2017. The complaint seeks a declaration of rights under the liability insurance policy and that Burlington, as insurer, has a duty to defend or indemnify Henstooth in the underlying action. *Id.* The Court previously denied Henstooth Ranch's motion to stay the case pending the resolution of the underlying action. Dkt. No. 24. Now before the Court are the parties' cross-motions for summary judgment.

**LEGAL STANDARD**

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party

bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting then Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . . ." *Id.* However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elec. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c)).

**DISCUSSION**

Henstooth moves for partial summary judgment that Burlington owes it a duty to defend. Conversely, Burlington filed a cross-motion for summary judgment that it does not have a duty to defend or indemnify Henstooth and, even if there is a duty to defend, two policy exclusions bar coverage. "To prevail in an action seeking declaratory relief on the question of the duty to defend, 'the insured must prove the existence of a potential for coverage, while the insurer must establish the absence of any such potential. In other words, the insured need only show that the underlying

claim may fall within policy coverage; the insurer must prove it cannot.'" *Delgado v. Interinsurance Exch. of Auto. Club of S. California*, 47 Cal. 4th 302, 308 (2009) (citing *Montrose Chemical Corp. v. Superior Court*, 6 Cal.4th 287, 300 (1993)). "The duty to defend exists if the insurer 'becomes aware of, or if the third party lawsuit pleads, facts giving rise to the potential for coverage under the insuring agreement.'" *Id.* (citing *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 19 (1995)). "Any doubt as to whether the facts give rise to a duty to defend is resolved in the insured's favor. Even a single claim that does not predominate, but for which there is potential coverage, will trigger the insurer's duty to defend." *Fire Ins. Exch. v. Superior Court (Bourguignon)*, 181 Cal. App. 4th 388, 392 (2010).

The Policy requires that "[t]he . . . 'property damage' is caused by an 'occurrence,'" which is defined as "an accident." "Under California law, the word 'accident' in the coverage clause of a liability policy refers to the conduct of the insured for which liability is sought to be imposed on the insured." *Delgado*, 47 Cal. 4th at 311. California courts note that "[a]n intentional act is not an 'accident' within the plain meaning of the word." *Royal Globe Ins. Co. v. Whitaker*, 181 Cal. App. 3d 532, 537 (1986). "An accident does not occur when the insured performs a deliberate act unless some additional, unexpected, independent, and unforeseen happening occurs that produces the damage." *Bourguignon*, 181 Cal. App. 4th at 392. "Where the insured intended all of the acts that resulted in the victim's injury, the event may not be deemed an 'accident' merely because the insured did not intend to cause injury." *Id.* "That does not mean, however, that coverage is always precluded merely because the insured acted intentionally and the victim was injured." *State Farm Gen. Ins. Co. v. Frake*, 197 Cal. App. 4th 568, 580 (2011) (internal quotation marks omitted). "Rather, an accident may exist 'when any aspect in the causal series of events leading to the injury or damage was unintended by the insured and a matter of fortuity.'" *Id.* (quoting *Merced Mut. Ins. Co. v. Mendez*, 213 Cal. App. 3d 41, 50 (1989)). "However, 'where damage is the direct and immediate result of an intended . . . event, there is no accident.'" *Id.*

Henstooth argues that it is unclear if the underlying complaint alleges that it acted deliberately. Pl.'s Mot. at 9. In contrast to the acts of tree removal and road access construction, Henstooth characterizes its restoration efforts as negligent, and states that any resulting damage

8

from those efforts "could not be expected or intended by Henstooth." *Id.* at 11. It claims that such "efforts, combined with the rainy season referenced by SLT, which allegedly lead [sic] to severe erosion on the property, are property damage arising out of an accident, thus triggering the Burlington policy." *Id.* at 11. The "extensive erosion" allegations, according to Henstooth, is property damage that was "unexpected, independent and unforeseen." *Id.* In response, Burlington argues that Henstooth's "focus on whether it expected or intended the alleged erosion to occur" is incorrect. Def.'s Reply (Dkt. No. 48) at 3. Instead, Burlington asserts the correct question is whether the restorative or remedial work was intentional. *Id.* at 3-4.

The Court agrees with Burlington. The underlying complaint alleges that despite a demand from SLT to hire a consultant and to provide SLT with a restoration plan, Henstooth instead took up "unilateral" restorative efforts that worsened the damage. Underlying Compl. ¶¶ 41-42. Thus, Henstooth intended to take up restorative efforts. It is irrelevant that Henstooth did not intend to cause additional harm. "[T]he term 'accident' does not apply where an intentional act resulted in unintended harm." *Frake*, 197 Cal. App. 4th at 582; *see also Albert v. Mid-Century Ins. Co.*, 236 Cal. App. 4th 1281, 1291, 187 Cal. Rptr. 3d 211, 219 (2015) ("The term 'accident' refers to the nature of the insured's conduct, and not to its unintended consequences."). Nor was the rain an "unexpected" or "unforeseen" circumstance; the alleged communications between SLT, the Thompsons, and Henstooth frequently reference the need to restore the property before the upcoming rainy season worsens the erosion.

Henstooth's arguments and cited authority do not persuade the Court otherwise. Henstooth invokes the example of a driver speeding, which California courts have used to illustrate the term "accident" as follows:

> When a driver intentionally speeds and, as a result, negligently hits another car, the speeding would be an intentional act. However, the act directly responsible for the injury—hitting the other car—was not intended by the driver and was fortuitous. Accordingly, the occurrence resulting in injury would be deemed an accident. On the other hand, where the driver was speeding and deliberately hit the other car, the act directly responsible for the injury—hitting the other car—would be intentional and any resulting injury would be directly caused by the driver's intentional act.

9

*Merced Mut. Ins. Co. v. Mendez*, 213 Cal. App. 3d 41, 50 (1989); *see also Delgado*, 47 Cal. 4th at 316. The focus in this example is on whether "the act directly responsible for the injury" was intentional or, instead, fortuitous. At the hearing, Henstooth argued that the restoration efforts were intentional, but that they were executed negligently because someone would not intend to cause more damage when they were trying to "restore" damage already caused. But this argument again focuses on whether Henstooth intended to cause harm—not whether it intended to perform "the act directly responsible for the injury." There is nothing in the complaint, and Henstooth has not presented any evidence, that "an aspect in the causal series of events leading to the injury or damage was unintended by the insured and a matter of fortuity." *Frake*, 197 Cal. App. 4th at 580. Rather, because the damage is alleged to be "the direct and immediate result of an intended . . . event, there is no accident." *Id.*

In a similar argument, Henstooth asserts that the restoration efforts were designed to prevent erosion and, therefore, that Henstooth did not intend the "further harm" alleged in the underlying complaint. Pl.'s Reply (Dkt. No. 46) at 3. As Henstooth correctly notes, "[l]iability policies have been held to cover damages resulting from an act undertaken to *prevent* a covered source of injury from coming into action, even if that act would otherwise not be covered." *State v. Allstate Ins. Co.*, 45 Cal. 4th 1008, 1025 (2009) (original emphasis). However, Henstooth does not identify what "covered source of injury" it was attempting to prevent. Rather, it was working to remedy the damage caused from allegedly intentional conduct.

Additionally, Henstooth points to *Lexington Insurance Co. v. Virginia Sur. Co., Inc.*, No. 12-cv-3438, 2013 WL 12130556 (C.D. Cal. Feb. 26, 2013), where the San Bernadino Associated Governments ("SANBAG") entered into a contract with Riverside Construction Company (RCC) to construct a freeway extension to protect the freeway from flooding. *Id.* at *2. The San Bernadino County Flood Control District sued SANBAG and others "to recover for the damage to, and taking of, its property caused by Defendants' construction of the [freeway project] and the related Cactus Channel that protects the freeway from flooding." *Id.* at *4-5. The complaint alleged that the "Freeway Project and Cactus Channel damaged pre-existing flood control facilities owned by the District[.]" *Id.* at *5. It further alleged liability "due to the negligent and/or other

10

wrongful acts or omissions of the Defendants in connection with their agreements to construct the Freeway Project and Cactus Channel, and failure to construct improvements to the Cactus Basins." *Id.* The court held that "it is at least possible that the property damage claimed by the District as a result of the construction of the freeway and Cactus Channel combined with the 2004-2005 rainy season could be considered an 'accident.'" *Id.* at *7. As Burlington notes, *Lexington* dealt with allegedly negligent conduct. There are no similar allegations here.

Also, Henstooth cites *Hartford Fire Insurance Co. v. Tempur-Sealy Int'l, Inc.*, 158 F. Supp. 3d 877 (N.D. Cal. 2016), where an underlying class action lawsuit alleged that defendants failed to inform consumers that the pillows and mattresses they sold emitted a chemical odor containing a known carcinogen and that exposure to the odor can and did trigger serious allergic reactions in consumers. *Id.* at 880. The plaintiffs alleged that had they known of the facts that defendants allegedly omitted or actively concealed, they would not have purchased the products for the retail price paid. *Id.* at 881. The insurer argued that it did not have a duty to defend because all of the causes of action rested on the same factual allegations of fraud and deceit. *Id.* at 886. The court rejected this, finding that the insurer "ignore[d] the causal series of events leading to the damage sustained as a result of Defendants' alleged misrepresentations—*i.e.*, the manufacture and sale of allegedly defective mattresses by Defendants." *Id.* at 886-87. Rather, the underlying complaint did not "provide a reason to think that the [alleged mattress defects] were expected," which was sufficient to demonstrate potential liability for an "occurrence." *Id.* at 887. Because there was a potential for a product defect cause of action to be added by future amendment to the underlying complaint, there was potential for coverage. *Id.* Additionally, although the underlying complaint contained allegations that the defendants knew of the alleged defects since 2007, the policy coverage began in 2004 and the putative class was not limited to any particular time period. *Id.* Therefore, the court found that there was a possibility that the underlying complaint sought damages for accidental sale of defective mattresses. *Id.*

Lastly, at the hearing, Burlington argued that Henstooth's arguments strayed outside of the factual record before the Court. In response, Henstooth cited *Tidwell Enterprises, Inc. v. Financial Pacific Insurance Company, Inc.*, 6 Cal. App. 5th 100 (2016), which explains that "facts

known to the insurer and extrinsic to the third party complaint can generate a duty to defend, even though the face of the complaint does not reflect a potential for liability under the policy. This is so because current pleading rules liberally allow amendment; the third party plaintiff cannot be the arbiter coverage." *Id.* at 106. But "[a]n insured may not trigger the duty to defend by speculating about extraneous 'facts' regarding potential liability or ways in which the third party claimant might amend its complaint at some future date." *Gunderson v. Fire Ins. Exch.*, 37 Cal. App. 4th 1106, 1114 (1995). Here, no allegations in the underlying complaint or extrinsic evidence raise the possibility that Henstooth's actions were negligent or accidental. Thus, there is no duty to defend. "Because the duty to defend is broader than the duty to indemnify, a conclusion that here [Burlington] did not have a duty to defend will be dispositive of plaintiff [Henstooth's] claim that [Burlington] had a duty to indemnify." *Delgado*, 47 Cal. 4th at 308 n.1 (internal citation omitted). Consequently, there is no duty to indemnify either. In light of these conclusions, the Court need not consider whether the impaired property exclusion or the farm premises liability exclusion precludes coverage.

## CONCLUSION

The Court DENIES plaintiff's motion for summary judgment and GRANTS defendant's cross-motion.

**IT IS SO ORDERED**.

Dated: January 3, 2018

_____
SUSAN ILLSTON
United States District Judge